IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| KATRINA STEINER, | ) | Civil No.: 6:11-cv-06425-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

Alan Stuart Graf
Alan Stuart Graf P.C.
316 Second Rd
Summertown, TN 38483

      Attorney for Plaintiff


S. Amanda Marshall, U.S. Attorney
Adrian L. Brown, Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204-2902

FINDINGS AND RECOMMENDATION - 1

Richard Rodriguez
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104

Henry E. Velte, III
Social Security Administration
Office of General Counsel
1301 Young Street, Suite A-702
Dallas, TX 75202

   Attorneys for Defendant

JELDERKS, Magistrate Judge:

  Plaintiff Katrina Steiner brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her applications for Disability Income Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act (the Act).  Plaintiff seeks an Order remanding the action to the Social Security Administration (the Agency) for an award of benefits.

  For the reasons set out below, the Commissioner's decision should be affirmed.

## **Procedural Background**

  Plaintiff filed the pending applications for DIB and SSI on June 24, 2009, alleging that she had been disabled since July 28, 2008 because of Crohn's disease, chronic stomach pain, chronic fatigue, depression, and pre-diabetes.[1]

---

[1]At the hearing, the ALJ noted that Plaintiff had filed applications earlier which had been denied in 2008.  He noted that Plaintiff had not appealed the denial of those applications, and Plaintiff's counsel asked that the earlier applications be reopened.  The ALJ indicated that he would consider that request in his decision concerning the pending applications.

FINDINGS AND RECOMMENDATION - 2

After her claims had been denied initially and on reconsideration, Plaintiff timely requested an administrative hearing.

On January 14, 2011, a hearing was held before Administrative Law Judge (ALJ) James Yellowtail.   Plaintiff and Kay Wise, a Vocational Expert (VE), testified at the hearing.

In a decision filed on February 8, 2011, ALJ Yellowtail found that Plaintiff was not disabled within the meaning of the Act.  That decision became the final decision of the Commissioner on October 23, 2011, when the Appeals Council denied Plaintiff's request for review.  In the present action, Plaintiff challenges that decision.

## **Background**

Plaintiff was born on November 20, 1965, and was 45 years old at the time of the ALJ's decision.  She graduated from high school,  completed one year of college, and was certified as a Nursing Assistant (CNA).  Plaintiff has past relevant work as the director of a day care center, a cashier, and a caregiver for senior citizens and disabled persons.  She has not worked since July 28, 2008.

## **Disability Analysis**

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

FINDINGS AND RECOMMENDATION - 3

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the presumptively disabling impairments listed in the Social Security Administration (SSA) regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal an impairment listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform relevant work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that

the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this

burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at

1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform

jobs that exist in significant numbers in the national economy.  Id.

### Medical Record

In his notes of a visit on February 6, 2006, Dr. Gregory Schandelmeier, Plaintiff's

treating physician, indicated that Plaintiff's migraines and restless leg syndrome had responded

well to an iron IV.  Plaintiff said she was not using a CPAP machine that had been prescribed

because it had broken and had not been replaced by her insurance company.  Dr. Schandelmeier

recommended that the machine be replaced.  He listed her diagnoses as including depression, a

history of migraines, hyperlipidemia, allergic rhinitis, metabolic syndrome, obstructive sleep

apnea, obesity, and reflux.

On July 13, 2007, Plaintiff reported that she had been experiencing severe abdominal

pain and cramping.

Based on a sleep apnea study conducted on October 10, 2007, Dr. Anton Lotman

diagnosed Plaintiff with severe sleep apnea.  He recommended that Plaintiff begin a one-month

trial on an automatic CPAP machine.

During a visit to Dr. Schandelmeier on December 13, 2007, Plaintiff reported that she

had experienced intermittent abdominal pain since the previous October, with the addition of

diarrhea during the previous month.  Dr. Schandelmeier recommended a colonoscopy.

On December 20, 2007, Plaintiff went to an emergency room with complaints of severe

abdominal pain.  The attending physician was not able to determine the cause of the pain.

FINDINGS AND RECOMMENDATION - 5

Based upon the results of a colonoscopy performed on January 14, 2008, Dr. Schandelmeier diagnosed non-specific colitis, and indicated that Plaintiff might have irritable bowel syndrome.

During a visit to Dr. Schandelmeier on February 14, 2008, Plaintiff reported persistent diarrhea, stomach pain, dizziness, and fatigue. Dr. Schandelmeier diagnosed Crohn's colitis and prescribed additional medications.

On February 16, 2008, Plaintiff again went to an emergency room with complaints of abdominal pain. Plaintiff reported feeling much better after IV morphine was administered. After the attending physician consulted with Dr. Schandelmeier, Plaintiff was discharged with a prescription for prednisone.

During a visit to Dr. Schandelmeier on March 14, 2008, Plaintiff reported that she continued to experience abdominal pain, but that it was less severe.

On April 8, 2008, Plaintiff went to an emergency room with complaints of low back pain. She was diagnosed with a urinary tract infection. Plaintiff returned to the emergency room on April 24, 2008 with complaints of abdominal pain and nausea. An attending physician diagnosed gastritis and exacerbation of Crohn's disease, and prescribed Flagyl. On April 30, 2008, Dr. Schandelmeier admitted Plaintiff to a hospital because of complaints of a migraine headache and nausea. Dr. Schandelmeier diagnosed a Crohn's disease flare and severe dehydration. He treated Plaintiff with IV Flagyl, adjusted her medications, and discharged her on May 3, 2008.

At Dr. Schandelmeier's request, Dr. Donald Yang, an enterologist, examined Plaintiff on July 17, 2008. Plaintiff told Dr. Yang that pain and fatigue were preventing her from working as

a caregiver.  Dr. Yang examined Plaintiff, reviewed her medical record, and diagnosed Crohn's disease.  He started Plaintiff on a course of steroids.

During an office visit with Kelly Smith, FNP on July 21, 2008, Plaintiff reported that her ongoing low back pain had recently worsened.  Smith noted that Plaintiff's straight leg raise test was positive on the right side, with increased low back pain.  Plaintiff was referred for x-rays, which did not show any degenerative changes.  Two days later, Plaintiff reported that her diarrhea was decreasing, but that she continued to experience fatigue and abdominal pain.  On July 29, 2008, Plaintiff reported that her diarrhea had increased, with some fecal incontinence, and complained of hip and back pain.

Plaintiff was again seen by Dr. Yang on August 15, 2008.  She reported having significant diarrhea three to four days a week, some improvement in her energy level, and continued low back pain.  Dr. Yang started her on a course of Humira injections.

During a visit to Smith, FNP, on August 19, 2008, Plaintiff reported that she "hurt all over," with aches in her head, back, legs, and neck.

During a visit to Smith, FNP, on September 18, 2008, Plaintiff reported that her Crohn's disease symptoms were better since she had started receiving Humira, and that she had less joint pain and stiffness.  During a telephone call to Dr. Yang's office on October 6, 2008, Plaintiff reported that she was feeling much better, and had more energy.  Dr. Yang agreed to Plaintiff's request to be tapered off prednisone, and scheduled reduction of that medication.

In a telephone call to Dr. Yang's office on October 24, 2008, Plaintiff reported that her symptoms, including a lack of energy, had returned since she began tapering her prednisone use.  Dr. Yang advised her to restart her prednisone treatment.

FINDINGS AND RECOMMENDATION - 7

A colonoscopy performed on  November 11,  2008, showed that Plaintiff's colitis had resolved, and that there was "no evidence of active colitis."  During a visit to Dr. Yang on December 12, 2008, Plaintiff reported that she continued to experience pain and some fatigue, and had  some improvement in her sacro-iliac pain.

A sleep study conducted on January 6, 2009, showed that Plaintiff had severe obstructive sleep apnea.  A follow-up study showed improvement with the use of a CPAP machine, but no optimal pressure was determined.  Dr. Lotman recommended further follow-up with a sleep specialist.

In a telephone call to Dr. Yang's office on January 20, 2009, Plaintiff reported that joint pain in her hands, ankles, knees, hips, and low back had increased during the previous two weeks, and  persisted regardless of her position.  Plaintiff was taking two hydrocodone tablets daily to help her sleep.  She said that she was "doing well" in regards to her Crohn's disease.  In his notes of a visit on the same day, Dr. Schandelmeier indicated that Plaintiff's intestinal symptoms related to Crohn's disease were well controlled, but that "extraintestinal" symptoms caused by the disease had worsened.  He restarted her on prednisone.

During a visit to Dr. Yang on February 18, 2009, Plaintiff reported that she was not experiencing abdominal pain or diarrhea.  Dr. Yang noted that she had no "active colitis symptoms" that would indicate Crohn's disease that was active at the time.  He did not think that her peripheral joint pain was related to Crohn's disease, and recommended that Plaintiff see a rheumatologist.

Dr. William Maier, a rheumatologist, evaluated Plaintiff on March 19, 2009.  He noted "widespread trigger point tenderness including symmetrical trigger points of the brachioradialis, mid trapezius, anterior chest wall, suprascapularis, rhomboids, posterior superior iliac crest

medial knee, [and] anterior shin." Dr. Maier found no evidence of inflammatory arthritis, and opined that Plaintiff's history and symptoms were "consistent with a fibromyalgia diagnosis." He referred Plaintiff back to Dr. Schandelmeier for management of her "fibromyalgia symptoms."

During a visit to Smith, FNP, on March 30, 2009, Plaintiff reported that she continued to experience hand and wrist pain with numbness when she awakened. Smith prescribed splints for Plaintiff's use at night.

During a telephone call to Dr. Yang's office on April 28, 2009, Plaintiff reported a recurrence of her diarrhea. She said the "flare" was correlated with stress caused by problems dealing with her son, and with her resumption of cigarette smoking. During a follow-up conversation on May 1, 2009, Plaintiff said that she was experiencing cramping and rated her pain a level 8 on a scale of 10.

On May 6, 2009, Plaintiff went to an emergency room with complaints of abdominal pain. Two days later Plaintiff was taken to a hospital by ambulance. A CT scan and lab tests were essentially normal. Plaintiff was told that her pain might be related to her use of Chantrix to help her stop smoking, and she was advised to discontinue that medication for three days.

During a visit to Dr. Yang on May 7, 2009. Plaintiff opined that her medical problems were related to stress caused by her son's frequent threats to her. Dr. Yang agreed that Plaintiff's "family situation" exacerbated the severity of her symptoms. He arranged for a small bowel capsule study to determine whether Plaintiff's abdominal pain was related to her Crohn's disease. The study, which was conducted on May 28, 2009, showed no evidence of active Crohn's disease. Dr. Yang noted that an upper endoscopy, colonoscopy, and abdominal CT scan had also shown no evidence of active Crohn's disease.

During a visit with Smith, FNP on June 18, 2009, Plaintiff reported that she had stopped using her CPAP machine because of stomach pain and back pain.  Smith noted that Plaintiff was to have surgery in a few days, and that she said she would  resume use of the CPAP machine after that procedure.

On June 8, 2009, Dr. Frank Larson performed an exploratory laparoscopy, and surgically reduced intra-abdominal adhesions he found during the procedure.

During a follow-up visit with Smith, FNP, on June 18, 2009, Plaintiff reported that, because of abdominal pain, she had not resumed use of her CPAP machine.  Smith noted that Plaintiff had symptoms that were consistent with obstructive sleep apnea and had been diagnosed with that disorder, and indicated that Plaintiff was aware of the significant risks that untreated sleep apnea presented.

Dr. Schandelmeier examined Plaintiff on July 2, 2009.  He noted that Plaintiff was "extremely upset and tearful" about her teenage son, and she felt that she was sleep deprived and worn out because of his conduct.  Dr. Schandelmeier characterized Plaintiff's lab results as generally "excellent."  He reviewed fibromyalgia "trigger points" and symptoms with her, and opined that many of her symptoms "fit" with a fibromyalgia diagnosis.  Dr. Schandelmeier indicated that he would prescribe Cymbalta for Plaintiff's depressed mood and Tramadol for her pain.

During a visit with Smith, FNP, on October 9, 2009, Plaintiff reported that she was feeling "much better overall" after she had started taking Cymbalta.  She said that she did not take Tramadol every day, and wondered if she could take more of that medication on days when her pain was greater.  Plaintiff reported that she was experiencing less stress because her son had been "away in a facility."  She added that he was to return to her home in November.

FINDINGS AND RECOMMENDATION - 10

During a visit with Smith, FNP, on November 4, 2009, Plaintiff reported that she was experiencing increasing pain, and wondered if she could take more Ultram, which helped relieve the pain. Plaintiff said that her anxiety had worsened, and that her son's planned return was very stressful.

Dr. Schandelmeier completed a functional capacity questionnaire dated November 15, 2009, which was provided by Plaintiff's counsel. Dr. Schandelmeier reported that Plaintiff's diagnoses included fibromyalgia, Crohn's colitis, and generalized anxiety disorder, and that her symptoms included pain, fatigue, inability to concentrate, and sleep disturbance. He opined that Plaintiff could not perform the full range of sedentary work, and could not sustain sedentary work.

James Wahl, Ph.D., conducted a psycho-diagnostic examination on September 21, 2009. Dr. Wahl found that Plaintiff did not display any significant cognitive limitation and appeared "clearly capable of understanding, remembering and carrying out at least moderately complex instructions." He opined that her mental status would not preclude employment, and that her ability to work should therefore evaluated based upon '"objective medical findings." Dr. Wahl diagnosed an adjustment disorder with depressed mood, and rated Plaintiff's Global Assessment of Functioning (GAF) score as 70.


**Testimony**

**Plaintiff**

Plaintiff testified as follows at the hearing before the ALJ:

Plaintiff stopped working because she had become ill: She could no longer work because her pain and fatigue had "gotten to be too much."

FINDINGS AND RECOMMENDATION - 11

Plaintiff's Crohn's disease was well controlled with medications at the time of the hearing, and fatigue and pain related to fibromyalgia were her greatest current problems. On good days, Plaintiff could stand for 30 to 45 minutes at a time and could sit for up to two hours at a time, but she was usually "wiped out." If she sat for two hours at a time she would be in pain the next day. Plaintiff had approximately one good day every two weeks. On bad days, she was in pain all day, had no energy, and spent most of her time lying down.

Plaintiff had been hospitalized for major depression twice between 2000 and 2003, and her depression increased when her symptoms worsened. Plaintiff was taking Cymbalta and BuSpar for depression and anxiety, and was using lorazepam as well, as "needed." She was not receiving mental health treatment at the time because her son's many appointments for autism treatment left little time for her own treatment.

When her energy level was up, Plaintiff would do housework, including sweeping, vacuuming, and mopping, and would cook better meals, which included frozen and canned foods. Sometimes Plaintiff was able to go grocery shopping, but often could not because of pain and fatigue. She used to crochet, knit, sew, and garden, but could no longer carry out these activities. Plaintiff's son and mother helped her with housework, and, with prompting, her son could care for himself. One "respite" provider cared for Plaintiff's son every Saturday, and another cared for him an additional 15 hours per month.

Plaintiff used a CPAP machine while sleeping. The supplemental oxygen improved the quality of her sleep, but she did not awake well rested.

**Lay Witness Statement**

In a questionnaire dated July 17, 2009, Rita Steiner, Plaintiff's mother, described Plaintiff's activities and limitations as follows: Rita Steiner and her husband helped Plaintiff care

FINDINGS AND RECOMMENDATION - 12

for her son and helped Plaintiff with household chores.  Because of her pain and fatigue, Plaintiff

did not cook full meals, but instead cooked only simple meals that could be prepared in a few

minutes.  Plaintiff could load the dishwasher, but sometimes took 15 to 20 minutes to complete

that chore if she needed to take a break.  She could drive only when her energy level was high

and she felt safe.  Rita Steiner and her husband sometimes did Plaintiff's shopping.

Pain and fatigue prevented Plaintiff from engaging in her former hobbies, which included

baking, cooking, sewing, and crafts.  Plaintiff was most comfortable lying down.

### ALJ's Decision

At the first step of his disability analysis, the ALJ found that Plaintiff had not engaged in

substantial gainful activity since the alleged onset of her disability.

At the second step, the ALJ found that Plaintiff had the following severe impairments:

morbid obesity, fibromyalgia, benign paroxysmal positional vertigo, and sleep apnea.

At the third step, the ALJ found that Plaintiff did not have an impairment or combination

of impairments that met or equaled a presumptively disabling impairment set out in the listings,

20 C.F.R. Part 404, Subpart P., App.1.

The ALJ next found that Plaintiff's residual functional capacity would allow her to

perform sedentary work, subject to the following limitations: She could lift up to 20 pounds

occasionally and 10 pounds frequently; was unable to climb ropes, ladders, and scaffolds; could

frequently balance; could occasionally stoop, kneel, crouch, and crawl; could frequently handle

or engage in gross manipulation bilaterally; needed to avoid moderate exposure to hazards in the

workplace such as unprotected heights and moving machinery; and required the flexibility for

brief changes of position for one or two minutes every half hour to relieve discomfort.  In

reaching this conclusion, the ALJ found that Plaintiff's statements concerning her functional limitations were not wholly credible.

Based upon the testimony of the VE, at the fourth step, the ALJ found that Plaintiff could not perform any of her past relevant work.

At the fifth step of his disability analysis, the ALJ found that Plaintiff could perform jobs that existed in substantial numbers in the national economy, and accordingly was not disabled within the meaning of the Act. Based upon the VE's testimony, the ALJ cited information clerk, clinic work, and Placement Interviewer positions as examples of this work.

## **Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Claimants bear the initial burden of establishing disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record, DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991), and bears the burden of establishing that a claimant can perform "other work" at Step Five of the disability analysis process. Tackett, 180 F.3d at 1098.

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or

detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9ᵗʰ Cir.

1986).  The Commissioner's decision must be upheld, however, even if "the evidence is

susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

### Discussion

Plaintiff contends that the ALJ failed to adequately support his rejection of Dr.

Schandelmeier's opinion, erred in finding that she was not wholly credible, and failed to provide

legally sufficient reasons for rejecting her mother's third party witness statements.

### 1. Rejection of Treating Physician's Opinion

Plaintiff's contends that the ALJ did not provide legally sufficient reasons for rejecting

Dr. Schandelmeier's opinion that she could not sustain full-time sedentary work.

### Evaluating Medical Opinion

The ALJ is required to consider all medical opinion evidence, and is responsible for

resolving conflicts and ambiguities in the medical testimony.  Tommasetti v. Astrue, 533 F.3d

1035, 1041 (9ᵗʰ Cir. 2008).  An ALJ is not required to find a physician's opinion as to a

claimant's physical condition or as to the ultimate question of disability conclusive.  Morgan v.

Commissioner, 169 F.3d 595, 600 (9ᵗʰ Cir. 2009).  In reviewing an ALJ's decision, the court does

not assume the role of fact-finder, but instead determines whether the decision is supported by

substantial evidence in light of the record as a whole.  Matney v. Sullivan, 981 F.2d 1016, 1019

(9ᵗʰ Cir. 1992).

Because treating physicians have a greater opportunity to know and observe their

patients, their opinions are given greater weight than the opinions of other physicians.

Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9ᵗʰ Cir. 1989).  An ALJ must provide clear and

convincing reasons, supported by substantial evidence in the record,  for rejecting a treating

physician's uncontroverted opinions.  Lester v. Chater, 81 F.2d 821, 830-31 (9th Cir. 1995).  An

ALJ must provide "specific, legitimate reasons . . . based upon substantial evidence in the

record" for rejecting opinions of a treating physician which are contradicted.  Magallanes v.

Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citations omitted).

## B. Analysis

As noted above, Dr. Schandelmeier, Plaintiff's treating physician, opined that Plaintiff

could not sustain full time sedentary work.  The ALJ rejected this opinion on the grounds that it

was "conclusory in nature, providing little explanation of the evidence relied on in forming that

opinion," was not supported by any "functional limitations" in Dr. Schandelmeier's treatment

records, and appeared "to rest at least in part on an assessment of fibromyalgia, which is outside

the doctor's area of expertise of primary care physician."

The Commissioner contends that the ALJ was required to provide only "specific and

legitimate" reasons for rejecting Dr. Schandelmeier's opinion because it was contradicted by the

opinions of Dr. Maier, an examining rheumatologist; Dr. Wahl, an examining psychologist; and

Dr. Eder, a non-examining state consultant.  Except as to a limited portion of Dr. Wahl's

opinion, I disagree.  The Commissioner correctly notes that Dr. Maier assigned no functional

limitations based upon Plaintiff's fibromyalgia diagnosis, reported that Plaintiff had no clubbing

or cyanosis in her extremities, found no evidence of inflammatory arthritis and reported a

relatively normal joint exam, and found that Plaintiff had good grip and range of motion in the

knees, ankles, and feet.  However, though Dr. Maier's evaluation did not directly support Dr.

Schandelmeier's conclusion that Plaintiff could not work, nothing in his report was necessarily

inconsistent with Dr. Schandelmeier's opinion: Dr. Maier simply did not assess Plaintiff's

residual functional capacity, and in the absence of such assessment, there is no basis for

concluding that his opinion as to Plaintiff's functional capacity necessarily differed from Dr. Schandelmeier's opinion.

Dr. Eder clearly disagreed with Dr. Schandelmeier's opinion that Plaintiff could not sustain full-time employment.  However, as Plaintiff correctly notes, under the circumstances presented here, the opinions of a non-examining consultant do not constitute substantial evidence that supports rejection of a treating doctor's opinion.  See Lester, 81 F.3d at 831.  Dr. Eder's difference of opinion therefore did not relieve the ALJ of the obligation to provide clear and convincing reasons for rejecting Dr. Schandelmeier's opinion.

Dr. Wahl contradicted at least two aspects of Dr. Schandelmeier's opinion.  Based on his psycho-diagnostic examination, Dr. Wahl found that Plaintiff's mental status would not preclude employment.  This is inconsistent with Dr Schandelmeier's opinion that Plaintiff's disabling symptoms included an inability to concentrate.   His diagnosis of an adjustment disorder with depressed mood was also inconsistent with Dr. Schandelmeier's assessment of Plaintiff's mental condition: Dr. Schandelmeier did not diagnose that disorder, but instead opined that Plaintiff had a generalized anxiety disorder–a condition which Dr. Wahl did not not diagnose.

Dr. Wahl did not directly address the physical issues upon which Dr. Schandelmeier appeared to largely base his opinion that Plaintiff could not work.  Dr. Wahl opined that Plaintiff's ability to work depended on her physical capacity, and asserted that the question of her disability should be determined based on "objective medical findings."

Under these circumstances, the ALJ may not have been required to provide "clear and convincing" reasons for rejecting Dr. Schandelmeier's opinion that Plaintiff could not sustain full time sedentary work.  Nevertheless, even assuming that this higher standard applied, a careful review of the medical record and the ALJ's decision support the conclusion that the ALJ

provided legally sufficient reasons for rejecting Dr. Schandelmeier's opinion that Plaintiff could not sustain even sedentary work.

Before turning to the ALJ's more convincing reasons, I note that the ALJ's observation that fibromyalgia was outside Dr. Schandelmeier's "area of expertise" is not a clear and convincing reason for discounting his fibromyalgia diagnosis or his opinion that Plaintiff was limited by symptoms of that disease. As noted above, Dr. Maier, a rheumatologist, concluded that Plaintiff's symptoms and history were consistent with a fibromyalgia diagnosis, and Dr. Maier indicated that Dr. Schandelmeier should be responsible for managing Plaintiff's "fibromyalgia symptoms." Under these circumstances, there is no basis for concluding that Dr. Schandelmeier lacked the expertise required to form opinions as to the presence of the disease and it's effects on Plaintiff's functional limitations.

The ALJ's other reasons for discounting Dr. Schandelmeier's opinion that Plaintiff could not sustain sedentary work are clear and convincing. The ALJ's characterization of Dr. Schandelmeier's opinion as "conclusory" is accurate: In the very brief questionnaire from Plaintiff's counsel that he completed, Dr. Schandelmeier simply listed Plaintiff's diagnoses and a few related symptoms, checked a blank indicating that Plaintiff could not perform a "full range of sedentary work," (an opinion the ALJ shared) and checked a blank indicating his conclusion that Plaintiff was "unable to sustain sedentary work." Dr. Schandelmeier did not discuss the basis of his ultimate conclusion that Plaintiff was disabled or set out any assessment of Plaintiff's postural limitations, lifting capabilities, and ability to sit, stand, and walk. This is significant, because an ALJ need not accept a doctor's opinion which is brief, conclusory, and inadequately supported by clinical findings. E.g., Bayliss by Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005).

The ALJ's observation that Dr. Schandelmeier's "actual treatment records" included no "functional limitations" is also accurate, and supports his rejection of Dr. Schandelmeier's ultimate assertion that Plaintiff is disabled.  In the absence of any objective functional analysis of Plaintiff's abilities to perform work-related activities,  Dr. Schandelmeier's conclusion that Plaintiff could not sustain sedentary work was effectively a vocational rather than a medical opinion.  This is significant, because vocational assessments are an area reserved for the Commissioner.  See Harman v. Apfel, 211 F.3d 1172, 1189 (9th Cir. 2000); Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003) (doctor's opinion as to whether claimant could work was not "medical opinion" within meaning of relevant regulations).  In addition, in the absence of any functional limitations "suggested" in his treating records, Dr. Schandelmeier's conclusion that Plaintiff could not perform sedentary work was inconsistent with his medical records.  The Commissioner correctly notes that inconsistencies are a legitimate basis upon which to discount a doctor's opinion.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995) (ALJ may reject doctor's assessment that is inconsistent with records).

The ALJ's reasons for giving "little weight" to Dr. Schandelmeier's opinion that Plaintiff could not sustain sedentary work are clear and convincing, and are supported by substantial evidence in the medical record.  The ALJ's discussion of the assessment submitted by Dr. Wahl, the consultative examiner, which immediately follows the discussion of Dr. Schandelmeier's opinion, further supports the ALJ's analysis of this treating doctor's opinion.  The ALJ found that Dr. Wahl's conclusion that Plaintiff's  mental status would not preclude employment was "consistent with the objective medical evidence showing improvement with the use of medication."  This observation is supported by substantial evidence that the symptoms of Crohn's disease, which Plaintiff originally cited as the primary basis of her alleged disability,

had largely resolved by the time of the hearing and that Plaintiff's other symptoms had improved

as well with medication.

2. **Plaintiff's Credibiltiy**

**Standards for Evaluating Credibilty**

     The ALJ is responsible for determining credibility, resolving conflicts in medical

testimony, and resolving ambiguities.  <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995).  If

a claimant produces medical evidence of an underlying impairment that is reasonably expected

to produce some degree of the symptoms alleged, and there is no affirmative evidence of

malingering, an ALJ must provide "clear and convincing reasons" for an adverse credibility

determination.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1281 (9th Cir. 1996); <u>Gregor v. Barnhart</u>, 464

F.3d 968, 972 (9th Cir. 2006).  If substantial evidence supports the ALJ's credibility

determination, it must be upheld, even if some of the reasons cited by the ALJ are not correct.

<u>Carmickle v. Commissioner of Social Security</u>, 533 F.3d 1155, 1162 (9th Cir. 2008).

     The ALJ must examine the entire record and consider several factors, including the

claimant's daily activities, medications taken and their effectiveness, treatment other than

medication, measures other than treatment used to relieve pain or other symptoms, and "any

other factors concerning the individual's functional limitations and restrictions due to pain or

other symptoms."  SSR 96-7.   An ALJ may also consider such factors as a claimant's

inconsistent statements concerning her symptoms and other statements that appear less than

candid, unexplained or inadequately explained failure to seek treatment or follow a prescribed

course of treatment, medical evidence tending to discount the severity of the claimant's

subjective claims, and vague testimony as to the alleged disability and symptoms.  <u>Tommasetti v.</u>

<u>Astrue</u>, 533 F.3d 1035, 1040 (9th Cir. 2008).

FINDINGS AND RECOMMENDATION - 20

**Analysis**

Because there is no evidence of malingering in the record, the ALJ was required to provide clear and convincing reasons for concluding that Plaintiff's description of her functional limitations was not wholly credible.

In support of his credibility determination, the ALJ first noted that, though Plaintiff alleged that she needed to be near a bathroom because of frequent diarrhea, could not sit for long periods, experienced chronic pain and fatigue, and had difficulty squatting, lifting, bending, standing, walking, climbing stairs, concentration, remembering, and completing tasks, her doctor's had cited "no functional limitations . . . during the relevant period." He noted that medical evidence indicated that Plaintiff's "condition had improved in terms of fibromyalgia, sleep apnea, vertigo, and Crohn's disease, which suggests that some of her limitations may not currently be as severe as alleged." The ALJ noted that, though Plaintiff testified that she needed to lie down throughout the day in order to be comfortable, there was not evidence that a treating physician had ever stated that this was necessary.

The ALJ also found that Plaintiff's allegations were only partially credible because they were inconsistent with her description of her daily activities. He noted that Plaintiff shopped for groceries, drove a car without difficulty, cooked, performed household chores when she had sufficient energy and with some assistance from her parents, who were not always present, was able to care for a teenage son who had autism. The ALJ asserted that Plaintiff's ability to care for a disabled child at home, with limited assistance, suggested that Plaintiff was not as severely limited as she alleged.

The ALJ further asserted that, though her medications had been "relatively effective" in controlling her symptoms, Plaintiff had not been "entirely compliant in taking prescribed

medications or using prescribed treatments . . . ."  He concluded that this was evidence that Plaintiff's symptoms were not as limiting as she alleged.

These are clear and convincing reasons for concluding that Plaintiff was not wholly credible.  They are supported by substantial evidence in the record, and adequately support the ALJ's credibility determination.  Even if a claimant's daily activities indicate some difficulty in functioning, they are relevant to an ALJ's credibility determination if they are inconsistent with the claimant's allegations.  Lingenfelter v. Astrue, 504 F.3d 1028, 1040 (9th Cir. 2007); Molina v. Astrue, 674 F.3d 1104, 1113 (9th Cir. 2012).  Medical evidence tending to discount the severity of symptoms and evidence of failure to follow prescribed treatment without good reasons supports the conclusion that a claimant is not wholly credible.  E.g., Tommasetti, 533 F.3d at 1039.  Likewise, the effectiveness of medications in controlling a claimant's symptoms is relevant in determining whether a claimant's statements concerning the intensity, persistence, and limiting effects of symptoms are entirely credible.  See Warre v. Commissioner, 439 F.3d 1001, 1006 (9th Cir. 2006) (impairments effectively controlled by medication not disabling).

The ALJ's credibility determination is supported by substantial evidence in the record, which the ALJ thoroughly reviewed, and should not be set aside on review.

### 3. **Rejection of Lay Witness Testimony**

As noted above, Rita Steiner, Plaintiff's mother, described Plaintiff's activities and limitations in a questionnaire provided by the Agency.  The ALJ observed that Rita Steiner "reiterated the exact same limitations" described by Plaintiff.  He gave "little weight" to her description of Plaintiff's symptoms and limitations because of her close relationship to Plaintiff and her lack of medical expertise.  He also asserted that Rita Steiner's description of Plaintiff's activities was "outweighed by the other factors discussed" in his decision.

Lay testimony describing a claimant's apparent symptoms and activities is competent evidence which must be considered, e.g., Molina v. Astrue, 674 F.3d 1104, 1114 (9th Cir. 2012) (citing Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1995), and an ALJ must provide "germane" reasons for rejecting such evidence. Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).

Plaintiff contends that Rita Steiner's relationship with her and lack of medical expertise are not "germane" reasons for rejecting lay witness statements. I agree. Friends and family members in a position to observe a claimant's symptoms and activities are competent to testify as to a claimant's condition, id. at 918 (citing Sprague v. Bowen, 812 F.3d 1226, 1232 (9th Cir. 1987)), and an ALJ cannot reject a witness's testimony on the grounds that he or she is a family member. Smolen.v. Chater, 80 F.3 1273, 1288 (9th Cir. 1996). By definition all lay testimony is given by witnesses who are not "expert," and ALJs are required to consider evidence from witnesses who are not expert medical sources. See 20 C.F.R. § 404.1513(e)(2).

Though the ALJ erred in discounting Rita Steiner's statements based upon her relationship to Plaintiff and lack of medical expertise, this action should not be reversed and remanded on this basis for two reasons. First, where a third party witness testifies to the same limits testified to by the claimant, and the claimant's testimony is properly discounted, the reasons for discrediting the claimant's testimony also apply to the third party witness's testimony. Molina v. Asture, 679 F.3d 1109, 1122 (9th Cir. 2012); James v. Astrue, 2012 Westlaw 1309166 at *5 (D. Or., April 12, 2012) (citing id.; Valentine v. Commissioner, 574 F.3d 685, 694 (9th Cir. 2009)) (where ALJ has properly discounted claimant's credibility, failure to reassess third party witness statement as to same limitations not error). Here, as the ALJ noted, Rita Steiner's description of Plaintiff's symptoms and limitations "reiterated" Plaintiff's own

testimony, and the ALJ provided legally sufficient reasons for concluding that Plaintiff herself was not wholly credible.

Second, any error in evaluating lay witness testimony is harmless if that testimony "is contradicted by more reliable medical evidence that the ALJ credited." Molina v. Astrue, 674 F.3d 1104, 1118-19 (9th Cir. 2012). Here, the ALJ supported his rejection of Rita Steiner's testimony in part on the grounds that it was "outweighed" by other factors discussed in his decision. Though he did not specify the factors to which he referred, elsewhere in his decision the ALJ cited and discussed substantial medical evidence that contradicted the degree of limitation to which Rita Steiner testified.

Under these circumstances, the ALJ's decision should not be reversed because of his error in basing his rejection of the lay witness statements largely on Rita Steiner's relationship to Plaintiff and lack of medical expertise.

## Conclusion

A Judgment should be entered AFFIRMING the decision of the Commissioner and DISMISSING this action with prejudice.

## Scheduling Order

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due April 8, 2013. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with

a copy of the objections.  When the response is due or filed, whichever date is earlier, the

Findings and Recommendation will go under advisement.

DATED this 20th day of March, 2013.


___/s/ John Jelderks_____

John Jelderks

U.S. Magistrate Judge

FINDINGS AND RECOMMENDATION - 25